HELENE N. WHITE, Circuit Judge,
dissenting.
I respectfully dissent. The parties agree that, after Davis distributed his letter of complaint regarding the noose on January 31, 2008,[9] Iacovetta removed the noose from the bulletin board and told Davis that she had “handled it.” Davis understood Iacovetta’s comment to mean that the noose was removed, and that the matter was closed. R. 32-1 at 2.
Havrilla, Davis’s immediate supervisor, worked in the area where the noose had been hanging on a bulletin board. Havril-la received a copy of Davis’s letter that day, although not from Davis. That afternoon Havrilla sent Iacovetta an email asking “How do you want me to handle this issue [Davis’s letter]?” Iacovetta responded, “Wait for me. Keep your mouth shut.” Havrilla then emailed Iacovetta that “Everyone is looking at me like I am a monster,” to which Iacovetta responded, “Well, you put the noose around your own neck.” R. 32-6.
The following day, February 1, 2008, Havrilla came to a meeting of the drivers and slammed the policy and procedure book down on the desk, complaining that he had been told that he did not follow it, and told the drivers they had to learn it. Davis felt that Havrilla’s ire was directed at him, R. 31-1 at 40-41, that the workplace environment changed after his complaint about the noose, and that he was being shunned. R. 31-1 at 40; R. 32-1 at 2.
On February 3, Havrilla emailed Iaco-vetta, “My wife wants to know if I am getting fired?” Iacovetta’s response included, “All focus is on his [sic] and the method he took rather than following chain of command and coming to me if he was uncomfortable talking to you.” R. 32-7. A reasonable jury could infer from these emails that Iacovetta and Havrilla were unhappy with Davis as a result of his complaint and were less interested in investigating Davis’s complaint than on faulting Davis’s method of distributing copies of his letter of complaint.
That inference is strengthened by the fact that for the three or so weeks following Davis’s distribution of his letter on January 31, 2008, Davis was not made aware that anything was being done regarding his complaint. Davis testified that no one in management communicated with him regarding the matter until late February, when Iacovetta said to him that “someone” from the corporate office was going to call him about his “little letter,” R. 31-1 at 182-183, a remark that can easily be interpreted as expressing animosity.
Unbeknownst to Davis, Iacovetta had contacted Calhoun regarding the noose matter and Calhoun told Iacovetta that she planned to travel from the corporate office to meet with Davis. There is no dispute that Iacovetta, Havrilla and Calhoun agreed that nothing would be said to Davis *112 until Calhoun arrived from the corporate office. And, although Calhoun’s visit was delayed by weeks due to a family emergency, Omnicare omits that Calhoun’s involvement in the matter and her forthcoming visit were not communicated to Davis. Thus, during the three or so weeks between Davis’s complaint and Iacovetta’s cryptic comment that someone from the corporate office was going to call him regarding his “little letter,” as far as Davis knew, nothing was being done regarding his complaint.
On February 21, 2008, Havrilla told Davis that someone from the corporate office was there to see him. Because Davis had not been advised that someone was actually coming to his worksite to meet with him, Calhoun’s on-site visit took Davis by surprise.
After meeting with Davis on February 21, Calhoun determined that diversity training would sufficiently address the noose matter and that no one would be disciplined. During the meeting, Davis had told Calhoun that he believed disciplinary action was in order. Calhoun testified that Davis wanted Iacovetta and Havrilla terminated. More importantly, Calhoun testified that she told Iacovetta after her meeting with Davis that Davis was upset with Iacovetta’s handling of the noose matter. R. 34-1 at 52-53. In addition, Calhoun testified that she may have told Iacovetta and Havrilla that Davis wanted their employment terminated. R. 34-1 at 53-56.
Unbeknownst to Davis, the week after Calhoun met with Davis, Havrilla reported to Iacovetta and Iacovetta then reported to Calhoun and Masters (the facility Human Resources representative) that Davis was not responding to phone calls and text messages from his router and Havrilla. Calhoun instructed Iacovetta to notify Davis both by phone and in writing that she, Calhoun, wanted to speak to Davis about this purported communication breakdown. Davis testified that he received no such notice and Omnicare presented no evidence to support that anyone spoke to Davis regarding the purported communication breakdown, which Davis denies occurred.
Against this backdrop, Havrilla left a voicemail message for Davis stating that he would like to sit down and talk on February 25, and a later message changing the date to February 26. Havrilla did not state a time or place in either message. On February 26, Davis was in the warehouse for at least an hour and both Havril-la and Iacovetta saw him, but did not approach him. So Davis left to make his deliveries. Iacovetta called him later that morning and said she was sorry that they, she and Havrilla, had missed him and that if there was anything Davis wanted to talk to them about, they would be in the office until 5 and 6 p.m., respectively.
On February 27, Havrilla came out as Davis was loading his truck and asked whether Davis had time to sit down to talk to him and Iacovetta that morning. Davis responded that Calhoun had made her decision about what she was going to do about the noose, and that he had a lot of work to do and did not have the time to sit down and talk that morning. Havrilla responded “okay” and walked inside the building. Davis testified that as he was getting ready to leave to make deliveries, he walked in the building, and Havrilla and Iacovetta were standing there. Iacovetta told him that Calhoun was on the phone and that Calhoun wanted to speak with him. This was the first that Davis knew of Calhoun’s involvement, and because he did not know that Calhoun wanted to discuss the purported communication breakdown with him, he assumed that she wanted to discuss the noose matter. Davis respond *113 ed that Calhoun had decided to handle the noose with diversity training and that he had nothing else to say. At that point, Iacovetta said to him that he did not get to choose — that he could sit down and talk or go home. Davis chose to go home. On his way home Davis received a message from Iacovetta that he was to report to work the next day.
Davis testified that at no time did he receive notice that Calhoun required that he speak to her, or that Calhoun wanted to speak to him about the purported communication breakdown. Davis first learned that Calhoun was involved when Iacovetta said to him on February 28 that Calhoun was on the phone. He was not told that Masters was on the phone, either. Davis at that point assumed that Calhoun wanted to speak to him about the noose — he did not know that Calhoun intended to address an alleged communication breakdown. In sum, Davis had no notice that he was required to talk to Iacovetta and Havrilla, or that Calhoun and Masters required that he speak with them by phone on February 27, or the subject matter of the conference call.
Calhoun decided to terminate Davis’s employment for insubordination based on her understanding that Iacovetta and Hav-rilla had told Davis that Calhoun required that Davis speak with her regarding Davis’s communication breakdown, when in fact, Davis received no such notice.
When Davis reported to work the following day, Iacovetta and Havrilla terminated his employment. Calhoun testified that had Davis spoken to her on the conference call, she likely would not have decided to terminate or even discipline him — she would have given him a second chance.
Calhoun’s deposition testimony makes clear that Iacovetta and Havrilla reported to her that Davis persisted in refusing to speak to Calhoun after Davis had been told that she wanted to talk to him. The majority’s contrary reading of the record is plausible, but it does not view the facts in a light most favorable to Davis. I would reverse the grant of summary judgment and remand the case to the district court for further proceedings.

. The photo of the noose in the record dispels the possibility that it could be perceived as anything other than a noose.